**Mark W. HAMMONS, as Next Friend of Jack M. Hammons, a minor, Plaintiff,**

v.

**ICON HEALTH AND FITNESS d/b/a Pro–Form, Defendant.**

**Case No. 06–cv–14509.**

United States District Court,
E.D. Michigan,
Southern Division.

March 23, 2009.

676

Thomas G. McHugh, Mount Clemens, MI, for Plaintiff.

Edward J. Higgins, Plunkett & Cooney, Detroit, MI, Andrea M. Johnson, Zausmer, Kaufman, Farmington Hills, MI, for Defendant.

## OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GERALD E. ROSEN, Chief Judge.

### I. INTRODUCTION

Plaintiff Mark W. Hammons, as next friend for his minor son Jack M. Hammons, brought this suit in a Michigan court, on September 7, 2006, asserting state law product liability, breach of warranty, and negligence claims against Defendant ICON Health and Fitness d/b/a Pro–Form. Plaintiff's claims arise from an incident in which Jack sustained severe and permanent injuries to his left hand after it became lodged between a thin plastic guard and the rear end component of a treadmill, designed and manufactured by the Defendant. The case was removed to this court on October 13, 2006, on the basis of diversity of citizenship. Michigan law governs this product liability action.

By motion filed on July 31, 2007, Defendant now seeks summary judgment in its favor. Only after this Court ordered Plaintiff to file a response in opposition to Defendant's summary judgment motion, did Plaintiff do so on December 12, 2007. Plaintiff's response largely summarized the deposition testimony of his expert witness, which was provided long after the discovery deadline and over a month after Defendant filed its Motion for Summary Judgment. On January 11, 2008, Defendant filed a reply in further support of its motion, arguing that Plaintiff's sole expert testimony is insufficient to sustain Plaintiff's claims.[1]

Having reviewed the parties' briefs in support of and opposition to Defendant's motion, as well as the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

### II. FACTUAL BACKGROUND

Mark W. Hammons ("Plaintiff") is the father of Jack M. Hammons ("Jack"), a minor, who resides in Macomb County, Michigan. In 1996, Plaintiff purchased the subject treadmill from a Sears department store. The treadmill, known as the Pro–Form 580si Treadmill, is designed, manufactured and/or marketed by Defendant ICON Health and Fitness, a Delaware corporation headquartered in Utah. Plaintiff assembled the treadmill in his home. Both Plaintiff and his wife, Michele, used the treadmill, primarily for jogging and

---

1. Defendant does not argue that the proposed testimony of Plaintiff's expert should be excluded for failing to meet the standards set forth in Fed.R.Evid. 702. Rather, the company argues that even with the testimony, Plaintiff will remain unable as a matter of law to establish each of the requisite elements of his product liability claims.

walking. At the time of the purchase, and throughout the course of the ownership, the treadmill appeared to be in proper working order. An owner's manual was included in the packaging. However, neither Plaintiff nor his wife read the manual in its entirety.

Jack was born on September 17, 2001. Plaintiff testified that both he and his wife consistently warned Jack against going near the treadmill and told him that it was dangerous. At first, the treadmill was kept in the basement, but after Michele gave birth to the couple's second son, Nick, the treadmill was moved to the master bedroom.

On August 15, 2005, approximately one month before his fourth birthday, Jack was in the master bedroom watching television, while his parents got ready for work. Plaintiff's 69-year old mother, Esther, arrived at the home to baby-sit Jack at approximately 8:00 AM. Both Plaintiff and Michele left for work. Jack asked Esther if he could continue watching television in the bedroom and she agreed. She then left Jack in the bedroom and a few minutes later heard a scream. She ran into the bedroom and found Jack standing at the foot of the treadmill with his hand behind him, screaming. The treadmill was going full speed and Esther immediately turned it off. She noticed that Jack had a burn taking up a large portion of the back of his left hand.

Jack later informed his parents that he had managed to start the treadmill by pressing buttons on the console. He was thrown backwards, where his left hand was caught between the rear plastic guard ("the rear hood") and the movable tread of the treadmill.

After receiving emergency medical attention and being taken to the hospital, Jack was diagnosed with a third-degree burn, described as a degloving abrasion. As a result of the injury, he required skin graft surgery, stitches, and the wearing of a compression glove. Jack underwent physical therapy and continued to wear the compression glove, 24 hours a day, seven days a week, for at least twelve months.

Plaintiff subsequently filed this product liability action against Defendant, asserting claims of negligent design, negligent manufacturing, failure to warn, and breach of warranties. Plaintiff supports his theories with expert testimony, Douglas R. Morita, an engineer who, in his deposition, presented his understanding of the sequence of events leading to the injury. Morita further opined that if the rear hood were absent or manufactured from a more rigid material, the injury would not have occurred. He stated that the gap between the rear hood and the moving tread is not obvious from all angles. Finally, Morita testified that he was unaware of other models of treadmills that feature a rear hood or trim like the rear hood at issue here. He concluded that removing the rear hood would not compromise the utility of the product, nor would it cost extra money, since it would involve an overall reduction in parts.

## III. ANALYSIS

### A. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences in favor of the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment must be entered "against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. To refute such a showing, the non-moving party must set forth specific facts sufficient to show that a reasonable fact-finder could return a verdict in his favor. *Sanders v. Freeman*, 221 F.3d 846, 851 (6th Cir.2000). To create a genuine issue of material fact, the non-moving party must present more than just some evidence of a disputed issue. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment.

**B. Plaintiff Has Failed to Produce Evidence of Defective Design.**[2]

■ Under Michigan law, "[a] manufacturer has a duty to design its product so as to eliminate any unreasonable risk of foreseeable injury." *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 692, 365 N.W.2d 176, 186 (1984); *see also Gawenda v. Werner Co.*, 932 F.Supp. 183, 187 (E.D.Mich.1996), *aff'd*, 127 F.3d 1102 (6th Cir.1997). Michigan courts have "accepted the social policy rationale that those injured by defective products should be compensated for their injuries ..., [but] they have never gone so far as to make sellers insurers of their

products and thus absolutely liable for any and all injuries sustained from the use of those products." *Prentis*, 365 N.W.2d at 181. Thus, a manufacturer's duty in designing products extends only to avoiding "unreasonable" risks. *See id; Owens v. Allis–Chalmers Corp.*, 414 Mich. 413, 432, 326 N.W.2d 372, 379 (1982) ("Manufacturers are not insurers that 'in every instance and under all circumstances no injury will result from the use' of their products.").

■ Plaintiff alleges that the treadmill, as designed, was unreasonably dangerous to minors because Jack was able to start the machine, and because the rear hood was either too flimsy or should not have existed at all given its potential risk as an "entrapment point." Plaintiff's relies solely on Morita's deposition testimony to establish a prima face case of design defect. Because Plaintiff has not presented sufficient evidence of the magnitude of the alleged risk, this Court concludes that Plaintiff has not established a prima facie case of design defect.

■ Michigan courts apply a risk-utility analysis to determine whether a plaintiff has made out a case for product liability based upon a claimed design defect. This test is applied without regard for whether the plaintiff is proceeding under a negligence or breach-of-warranty theory. *Prentis*, 365 N.W.2d at 185–87; *see also Gregory v. Cincinnati Inc.*, 450 Mich. 1, 538 N.W.2d 325, 329 (1995); *Berry v. Crown Equipment Corp.*, 108 F.Supp.2d 743, 756–57 (E.D.Mich.2000). The seminal Michigan case on this analysis, *Owens v. Allis–Chalmers Corp.*, states that a prima facie case for a design defect claim requires "data or other factual evidence con-

---

**2.** In his Complaint, Plaintiff alleges that Defendant "failed to design, manufacture and/or market a product that was safe for use *in or around the vicinity of minors*," (Compl. ¶ 9(f)) (emphasis added), but cites no legal authority

for this particularized type of duty. Accordingly, the Court evaluates Plaintiff's claims as a claim of design defect and, separately, as a claim of manufacturing defect, addressed in the following two sections.

cerning" both the magnitude of the risks involved and the reasonableness of any proposed alternative design. 326 N.W.2d at 379.

■ In the context of the first "magnitude of risk" prong, where the specific frequency of similar accidents is unknown, a plaintiff bears a particularly "heavy burden" in proving that the defendant's chosen design was unreasonably dangerous. *Owens,* 326 N.W.2d at 379. This burden must be met with evidence beyond an expert's speculation: "If a plaintiff may proceed with merely the opinion of an 'expert witness' retained specifically for that purpose, whose unsupported testimony is construed to create an 'issue of material fact' to avoid summary judgment under Fed. R. Civ. Proc. 56(c), it is difficult to conceive of any product liability case that could not proceed to trial." *Zettle v. Handy Mfg. Corp.,* 998 F.2d 358, 361–62 (6th Cir.1993). For example, in *Peck v. Bridgeport Machines, Inc.,* 237 F.3d 614, 617–18 (6th Cir.2001), the Sixth Circuit evaluated a product liability claim brought by a worker who was injured while using a lathe that was inadvertently activated and severely injured one of its users. *Peck,* 237 F.3d at 618. The plaintiff's expert "testified that he had never heard of similar accidents occurring with lathes and did not know the probability of a similar accident happening." *Id.* This testimony without more, the court concluded, was insufficient to satisfy the magnitude of risk prong of the risk-utility analysis under Michigan law. *Id.*

In this case, Plaintiff has offered no data or factual evidence of similar incidents, and little more than his expert's conclusions as to whether the severity of the injury or the likelihood of its occurrence was foreseeable by the manufacturer at the time of the distribution of the product.

Plaintiff's expert, Morita, stated that he is "personally unaware of any other accidents where someone had been entrapped in between that trim piece and the metal guard and was injured by the belt." (Morita Dep. 86:14–17, Sept. 14, 2007.) Morita admitted that past treadmill cases in which he testified involved only injuries suffered when people were thrown off a treadmill, because the products at issue either inadvertently started or inadvertently sped up. He nevertheless concluded that Jack's injury in this incident was "foreseeable." (Morita Dep. 86:21–24.)

> Basically I believe it's been known time immemorial ... how people will fall or be caused to fall on a treadmill and be carried along with the belt. I mean, that's the main purpose for the cord, the key switch. Most companies call them ... emergency switches or emergency stop switches. But that is in fact the starting action for the accident sequence, ... falling, being carried along the belt, entirely foreseeable. Then if you look at, you know, what occurs as you are being carried along, then it's my opinion that ... you do identify a hazard [and] that it is foreseeable that someone would get caught. Just because they know or should have know [sic] how easy it is to move that trim piece away from the guard.

(Morita Dep. 105:6–20.) Based on an examination of photographs of the subject treadmill,[3] and on his knowledge of other treadmill models, Morita concluded that Defendant created a hazard, by including the rear hood, and failed to protect against any possible entrapment risks the hood posed, by using an inappropriate material.

In the absence of evidence of past similar incidents, Morita's testimony alone

---

3. One such photograph showed an adult hand pulling up on the plastic trim of the rear hood. Morita testified that this was indica-tion of how easily it could become a entrapment point.

does not meet the heightened burden set out in *Owens*. While Morita identified the flexibility of the rear hood material, the size of the gap and the likely trajectory of Jack's body and hands as he moved backward on the tread, these taken together do not establish the magnitude of the risk. Rather, it explains how the events in this particular case likely occurred. Morita's testimony acknowledges that Defendant's design accounts for the foreseeable risk of inadvertent starts,[4] but it does not provide data or factual evidence of the foreseeability of children starting the machine in spite of the safety mechanisms and warnings. Even Plaintiff and his wife acknowledged that the accident, as it occurred, was entirely unforeseeable given all the safety mechanisms and warnings included with the product. (Ex. A p. 23–25; Ex. B p. 86.) Nothing further in the record establishes the likelihood of the particular injury posed by the design, and nothing beyond Morita's conclusory statements after only a review of photographs supports the allegation that Defendant knew or should have known of this particular entrapment risk.

Finally, Michigan courts have held that statistical or factual deficiencies do not prevent the plaintiff from making a prima facie case of designs defect, where there is testimony that the product is *in general* unsafe and that an alternative design would have prevented the plaintiff's accidents. *See Reeves v. Cincinnati, Inc.*, 176 Mich.App. 181, 189–90, 439 N.W.2d 326, 330 (1989). In *Reeves*, the court evaluated the sufficiency of evidence in a products liability case involving a power press. The court recognized that even though the parties lacked "a statistical breakdown of the risks of injuries caused by presses with and without" the proposed safety mechanism, there was considerable evidence that power presses in general were prone to this type of malfunction. *Reeves*, 439 N.W.2d at 330. Accordingly, the court held that, in light of this body of evidence, any statistical deficiencies in the expert testimony did not prevent plaintiffs from making a prima facie case. In this case, Plaintiff has not provided anything approaching the type of body of evidence found sufficient in *Reeves*, to suggest that treadmills with a rear hood are commonly known to be unsafe or prone to this type of injury.

Although Plaintiff presented evidence of reasonable alternative designs, the second prong of the risk-utility analysis, the Court finds that he has failed to establish a prima facie case of design defect because he has not shown that the treadmill, as designed, presents an unreasonable magnitude of risk. Defendant is thus entitled to summary judgment on the design defect claim.

## C. Plaintiff Has Failed to Produce Evidence of Manufacturing Defect.

A manufacturer has a duty to manufacture a product to eliminate unreasonable risks of foreseeable injury. *See Fabbrini Family Foods, Inc. v. United Canning Corp.*, 90 Mich.App. 80, 93, 280 N.W.2d 877, 883 (1979). In order for Plaintiff to establish a manufacturing defect, it must show that 1) the product was defectively manufactured, 2) the product reached the plaintiff in the same condition as it was when it left the manufacturer and 3) the defect was the proximate cause of the person's injuries or damages. *See Allstate Ins. Co. v. Icon Health & Fitness,*

---

4. Laurel Jensen, Director of Product Safety at ICON Health and Fitness, testified that the subject treadmill featured numerous built-in safety mechanisms, including: an "on/off" switch on the base of the unit, the requirement to insert a "key" prior to use, and the need to re-set the unit prior to each use.

*Inc.,* 361 F.Supp.2d 673, 677 (E.D.Mich. 2005) (citing *Prentis,* 421 Mich. 670, 365 N.W.2d 176). Plaintiff need not identify the specific nature or cause of this alleged defect, nor is he compelled to produce expert testimony in support of his claim. *See Holloway v. General Motors Corp.,* 403 Mich. 614, 271 N.W.2d 777, 783–84 (1978). The product must "be evaluated against the manufacturer's own production standards, as manifested by the manufacturer's other like products." *Prentis,* 365 N.W.2d at 182.

 The record lacks sufficient evidence from which a trier of fact could conclude that the subject treadmill was defective at the time it left Defendant's control. In addition to Plaintiff and Plaintiff's wife's testimony that the treadmill functioned properly from the time of its purchase in 1996, Defendant's expert, Jensen, inspected the subject treadmill on January 11, 2007, and found that it was in proper mechanical and electrical order and met with ICON design and manufacturing specifications. (Def. Mot. for Summ. J. Ex. J.) Plaintiff's expert did not inspect the subject unit or an exemplar, and acknowledged that he is not familiar with the Defendant's production standards, other than the answers to interrogatories provided to Plaintiff. Notably, Plaintiff all but drops this claim in his response to Defendant's Motion for Summary Judgment.

There is no evidence in the record to support the contention that the rear hood was defective when "evaluated against the manufacturer's own production standards." *Prentis,* 365 N.W.2d at 182. Nor is there evidence from which Plaintiff could satisfy his burden to show that "a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater harm to others." Mich.

Comp. Laws § 600.2946(2). Finally, Jensen testified that the treadmill went through intensive testing, auditing, and reviews before it was placed on the market.

A trier of fact could not permissibly conclude that the treadmill was not "reasonably fit for its intended or foreseeable use" at the time it left Defendant's control. Consequently, Defendant is entitled to summary judgment in its favor on Plaintiff's manufacturing defect claim.

### D. Plaintiff Has Failed to Produce Evidence of a Failure to Warn.

 Under Michigan law, a manufacturer has a duty to warn of dangers associated with the intended uses or reasonably foreseeable misuses of the product. *Portelli v. I.R. Constr. Prods. Co.,* 218 Mich.App. 591, 598–99, 554 N.W.2d 591, 596 (1996); *see also Peck,* 237 F.3d at 618. In order to be held liable under Michigan law for a failure to warn, a plaintiff must show that the seller or manufacturer:

(a) had actual or constructive knowledge of the alleged danger,

(b) had no reason to believe that consumers would know of this danger, and

(c) failed to exercise reasonable care to inform consumers of the danger.

*Hollister v. Dayton Hudson Corp.,* 201 F.3d 731, 741 (6th Cir.2000). A plaintiff must also establish causation and damages. Where causation is lacking, the question of duty to warn need not be addressed. *Fisher v. Kawasaki Heavy Indus., Ltd.,* 854 F.Supp. 467, 472 (E.D.Mich.1994).

 Plaintiff argues that Defendant did not provide any warnings specifically regarding the risks and/or hazards caused by the rear component of its product. However, because a manufacturer's duty to warn is limited to foreseeable uses of a product and attendant risks, rather than possible consequences or types of injuries,

the Court concludes that Plaintiff has not established a prima facie case of failure to warn.

■■■■ The scope of a manufacturer's duty to warn is not unlimited. *Glittenberg v. Doughboy Recreational Indus.*, 441 Mich. 379, 491 N.W.2d 208, 212–13 (1992). There is no duty to warn with regard to unforeseeable uses of a product. *Trotter v. Hamill Mfg. Co.*, 143 Mich.App. 593, 372 N.W.2d 622 (1985); *see also* Mich. Comp. Laws § 600.2948(3) (A manufacturer or seller cannot be held liable under a failure-to-warn theory "unless the plaintiff proves that the manufacturer knew or should have known about the risk of harm based on the scientific, technical, or medical information reasonably available at the time the specific unit of the product left the control of the manufacturer"). In addition, nothing in the Michigan statutes imposes a duty to warn of *a specific injury* that could result from a risk. *Greene v. A.P. Products, Ltd.*, 475 Mich. 502, 717 N.W.2d 855, 860 (2006); *see also Glittenberg*, 491 N.W.2d at 212–13 (holding that the threshold issue is whether people, in general, are unaware of the fact that there is a risk of serious harm, not the specific type of harm). Finally, whether there is a duty to warn is a question of law for the court. *Fleck v. Titan Tire Corp.*, 177 F.Supp.2d 605, 616–19 (E.D.Mich.2001).

Plaintiff has failed to make out this claim. Defendant provided numerous warnings alerting purchasers and users to the risks associated with children using, or being near, the product, as well as precautions for avoiding inadvertent injuries. The owner's manual cautions that owners should "read all precautions and instructions in the manual" before use. (Def. Mot. for Summ. J. Ex. K.) Page three of the manual lists a number of specific pre-cautions "to reduce the risk of burns, fire, electric shock or injury to persons." (Ex. K, p. 3.) Item six on page three of the manual states: "Keep small children and pets away from the machine at all times." (Ex. K, p. 3 n. 6.) A precaution states: "Never leave the treadmill unattended while it is running. Always remove the key and move the on/off switch to the 'off' position when the treadmill is not in use." (Ex. K, p. 3 n. 18.) Lastly, the console of the machine states:

CAUTION! TO AVOID INJURY. Read users manual first. Don't stand on walking belt when starting treadmill. Moving parts can cause injury; use caution, and keep children away. Stop if you feel faint, dizzy, or short of breath.

(Ex. L.)

Plaintiff acknowledged in his deposition that he did not believe that any failure to warn claim existed, given his and his wife's understanding of these dangers:

Q: Do you believe that ICON failed to warn you of any dangers associated with its product?

A: No, I think they did their job in putting the warnings on the machine ... (Ex. A, p. 95.) Although a plaintiff's subjective awareness of a risk is not relevant to interpreting what the manufacturer knew or should have known for failure to warn claims, it is noteworthy that Plaintiff and his wife demonstrated clear knowledge that the treadmill was dangerous for children and repeatedly warned Jack to stay away from it.[5]

■■■■ Taken together, the foregoing evidence indicates an admission that there was no duty to warn, beyond the warnings clearly provided.[6] In addition, the Court

---

5. Morita declined to offer any opinion as to whether there was a failure to warn.

6. Defendant argues in the alternative that the open and obvious doctrine should apply in this case and that because the risk inherent.

finds that even if Plaintiff had presented sufficient evidence to create a genuine issue of fact as to Defendant's duty to warn, he has offered no evidence to establish causation. "[T]o establish a prima facie case that a manufacturer's breach of its duty to warn was a proximate cause of an injury sustained, a plaintiff must present evidence that the product would have been used differently had the warnings been given." *Mascarenas v. Union Carbide*, 196 Mich.App. 240, 251, 492 N.W.2d 512, 517 (1992). Plaintiff has made no such showing. Accordingly, Defendant is entitled to summary judgment on the failure to warn claim.

**E. Plaintiff's Remaining Claims of Breach of Express and/or Implied Warranties Must Fail Because He Has Failed to Establish the Requisite Elements of a Design Defect Claim.**

 Recovery under either a theory of negligence or breach of warranties requires proof of a defective design. *Prentis*, 365 N.W.2d at 186; *see also Smith v. E.R. Squibb & Sons, Inc.*, 405 Mich. 79, 273 N.W.2d 476 (1979). "When proceeding under a theory of implied warranty, a design defect is established by proof that the product is not reasonably safe for the uses intended, anticipated, or reasonably foreseeable." *Prentis*, 365 N.W.2d at 186.

Michigan law states that a "defendant is not liable for failure to warn of a material risk that is or should be obvious to a reasonably prudent product user or a material risk that is or should be a matter of common knowledge to persons in the same or similar position as the person upon whose injury or death the claim is based in a product liability action." Mich. Comp. Laws § 600.2948(2).

Michigan courts have narrowed the open and obvious doctrine to "simple tools or products," or products with universally known

Because Plaintiff has failed to make out a prima facie case for design defect, his claims of breach of express and/or implied warranties must also fail.

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [dckt # 23] is GRANTED.

**CHAMPION LABORATORIES, INC., Plaintiff,**

v.

**PARKER–HANNIFIN CORPORATION, including its Racor Division, Defendant.**

### Case No. 07–12493.

United States District Court, E.D. Michigan, Southern Division.

April 30, 2009.

characteristics, "not ... device[s] with parts or mechanism." *Glittenberg*, 491 N.W.2d at 213 (holding above-ground swimming pools are "simple tool" subject to open and obvious doctrine analysis). Generally, where reasonable minds could differ as to whether a product is a "simple tool," the analysis becomes a question of fact to be determined by a jury. *Id.* at 217. In this case, the Court need not reach this question, where Defendant provided ample warning of possible hazard.

J. Kenneth Wainwright, Jr., Barry B. Sutton, Harvey Kruse, Troy, MI, Paul Olszowka, William R. Lee, Wildman, Harrold, Chicago, IL, for Plaintiff.

Robert Y. Weller, Abbott Nicholson, Detroit, MI, for Defendant.

### ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PAUL D. BORMAN, District Judge.

Before the Court is Defendant Parker–Hannifin Corporation's Motion for Summary Judgment, filed December 12, 2008. (Doc. No. 17). Parker–Hannifin's Racor Division is the subject of this lawsuit and, therefore, the Court will refer to Defendant Parker–Hannifin as "Racor" as the parties have done in the pleadings. Plaintiff Champion Laboratories, Incorporated, ("Champion") responded to Racor's motion for summary judgment on February 3, 2009. (Doc. No. 35). The Court heard oral arguments on April 15, 2009. For the reasons discussed below, the Court **DENIES IN PART** and **GRANTS IN PART** Racor's motion for summary judgment.

### I. BACKGROUND

This lawsuit arises out of Champion's claims that Racor disparaged its product, a fuel filter, to General Motors ("GM"), in an effort to recover the GM fuel filter business Racor had previously lost to Champion when Champion produced and sold a substantially similar, but cheaper, version of Racor's Duramax filter to GM.

Both Champion and Racor are automotive suppliers engaged in the business of producing and selling automobile parts to car manufacturers. (Compl. ¶¶ 15, 17). Champion is a Delaware corporation that has its principal place of business in Albion, Illinois. (Compl. ¶ 14). Racor, a division of Parker–Hannifin, is an Ohio corporation that is headquartered in Cleveland, Ohio. (Compl. ¶ 17). Champion and Racor are competitors in the fuel filtration products market. (Compl. ¶ 24).

The product at issue in this case, a fuel filter designed for use in General Motor's 6.2 liter turbo diesel engine called "Duramax," was first designed and manufactured by Racor. (Compl. ¶¶ 27, 32). Racor was GM's designated Original Equipment Manufacturer ("OEM") for the Duramax filter, meaning that Racor manufactured and furnished to GM all the of original fuel filters inserted into the Duramax engine at the factory. (Compl. ¶ 32). Champion obtained a contract with GM's Service Parts Organization ("SPO") to furnish replacement Duramax filters to GM service providers. (Compl. ¶ 33). Initially, Champion fulfilled the aftermarket contract by purchasing filters from Racor and selling the filters to GM. (Compl. ¶ 34).

This arrangement was not very profitable for Champion and, in 2003, Champion began to design its own Duramax filter. (Compl. ¶ 36). In 2005, Champion introduced a prototype version of its Duramax filter; Champion later received a patent for its design. (Compl. ¶¶ 36–37). After extensive testing, SPO approved Champion's filter for use in the Duramax engines. (Compl. ¶ 38). Champion then discontinued buying filters from Racor, and used its own filters to fulfill its aftermarket contract with GM and has also sold the filters to other aftermarket purchasers. (Compl.

¶¶ 39–38). Racor continues to be the OEM supplier of Duramax filters.

Shortly after Champion stopped buying filters from Racor, Racor decided to attempt to regain the aftermarket filter business. (Compl. ¶ 40). In January 2007, Robert Sabo, Racor's regional sales manager, was instructed to persuade GM to stop buying aftermarket Duramax filters from Champion. (Pl.'s Resp. Ex. K, Defendant's Written Response to Plaintiff's First Set of Requests for Admission ¶ 33). Racor then went on the offensive, planning an "attack strategy" to recover the aftermarket Duramax filter business. (Pl.'s Resp. Ex. A, Email from Dinges to Sabo, 1/17/07). Racor learned that the only way the GM Powertrain Engineering division, that wanted Racor to supply aftermarket filters, could reverse GM SPO's purchasing decision was if it was shown that Champion's filter did not meet GM's requirements, presented a safety risk or was defective. (Defendant's Written Response to Plaintiff's First Set of Requests for Admission ¶ 32). Racor also learned from Bob Straub, the GM Powertrain Technology Leader, that GM Powertrain Engineering was "extremely concerned" about the Champion filters "in relationship to warranty concerns" because GM had previously paid out at least $100 million in warranty costs to replace fuel injectors in the Duramax engines before the Racor filter was utilized. (Pl.'s Resp. Ex. L, Email from Sabo to Lewis and Dinges, 1/21/07).

Because the only way Racor could recover the business was to show that the Champion filter did not meet GM's requirements, presented a safety risk or was defective, the Racor sales team asked Racor engineers to test the Champion filter for such deficiencies. (Pl.'s Resp. Ex. E, Email from Sabo to Stone, 2/23/07). The Champion filter performed at least equally as well as the Racor filter in all of the usual tests that the Racor engineers ran on the filter. (Pl.'s Resp. Ex. Z, Email from Reiland to Dinges, 2/15/07; Pl.'s Resp. Ex. E. Email from Reiland to Edge, 2/22/07).

Racor engineers then began looking for a test that would show that Racor's filter was better at filtering out particles smaller than four microns; GM had had many warranty claims in the past due to ultrafine particles, smaller than four microns, passing through the filter and damaging the fuel injectors. (Def.'s Mot. Ex. F, Dinges Dep. 42–43; Def.'s Mot. Ex. D, Email from Stone to Sabo, 2/22/07). The problem became, however, that there was no standard testing method to measure particles smaller than four microns. (Email from Stone to Sabo, 2/22/07). Racor engineer Wally Stone expressed concern to Sabo that testing for two micron sized particles was unprecedented. (Email from Stone to Sabo, 2/22/07). Stone was also concerned that he would not be able to defend the testing procedure. (Email from Stone to Sabo, 2/22/07).

Sabo pressed Stone and Cheryl Reiland, also a Racor engineer, to find a way to test the filters in a manner that would distinguish Racor's filter from Champion's filter. (Def.'s Mot. Ex. D., Email from Stone to Sabo, 2/23/07). Steve Hardison, Racor's Fuel Project Manager, suggested that they use gravimetric testing, which measures the weight of the particles that pass through the filter. (Def.'s Mot. Ex. C, Stone Dep. 53–54). The object of the testing would be to show which filter did a better job of filtering out ultrafine particles. (Stone Dep. 54). After performing the first gravimetric tests, Racor found that there was "1.39 times more dirt in the effluent of the Wix filters or the Racor had 72% of the dirt in the Wix effluent." (Pl.'s Resp. Ex. EE, Email from Stone to Sabo, 3/1/07). Later, Stone emailed Sabo to report that they "got some pretty wild re-

sults on the Champion filters," and recommended that Racor refrain from sharing the data with GM until they could "get the whole picture." (Pl.'s Resp. Ex. EE, Email from Stone to Sabo, 3/1/07). In response, Sabo scolded engineering for not getting the data to him sooner but commended Hardison for his hard work, noting that they had also received positive crash and impact testing results now that Hardison was involved. (Pl.'s Resp. Ex. EE, Email from Sabo to Stone, 3/2/07). Sabo also indicated that he would not postpone Racor's meeting with GM, stating "I am going to GM today and I will be presenting the data below along with the other data we have acquired for our arguments." (Email from Sabo to Stone, 3/2/07).

On March 2, 2007, Racor emailed GM its presentation and, on March 7, 2007, Racor gave an on-site presentation. The March 2, 2007, presentation that Racor emailed to GM stated that the filters performed essentially equally in the differential pressure drop, filter efficiency, contamination life and water separation tests. (Pl.'s Resp. Ex. F, General Motors Champion–Racor Technical Comparison, Filter Performance Comparison). Racor differentiated the filters by highlighting the gravimetric testing, in which the Racor filter removed more particles than the Champion filter. (General Motors Champion–Racor Technical Comparison, Filter Performance Comparison). Racor also suggested that the lip seal capture design used in the Champion filter was faulty because the lip seal, "almost always remains in the head, stuck on the spud. It is difficult to remove, especially in blind vehicle service. Using a tool to remove may scratch and damage sealing surface." (General Motors Champion–Racor Technical Comparison, Champion Lip Seal Capture Design). Racor criticized Champion's tap cap design, stating, "Racor has determined that the o-ring gland depth is too deep, allowing the

o-ring to sit too low in the gland, and the tap cap to bottom out on the head. This creates the possibility of low o-ring compression and leaks." (General Motors Champion–Racor Technical Comparison, Champion Tap Cap Design). With respect to Champion's rolled can design, Racor stated that the, "Metal forming over the tap cap ribs are very sharp, which creates many stress points prone to vibration wear and leaking. Design may be vulnerable to impact." (General Motors Champion–Racor Technical Comparison, Champion Rolled Can Design Weakness). Lastly, Racor stated that Champion's float switch thread rings were "oversized" and "out of tolerance," which could lead to a "massive fuel leak." (General Motors Champion–Racor Technical Comparison, Champion Float Switch Thread Ring Tolerance).

After Racor emailed GM the presentation on March 2, 2007, its engineers continued to test the fuel filters. Stone emailed Sabo to warn him that the testing results Sabo provided to GM are based on tests run on Wix filters, not Champion filters and, "If these are supposedly the same elements [filters], we saw far different results later in the day on Champion marked ones." (Pl.'s Resp. Ex. JJ, Email from Stone to Sabo, 3/2/07). In a different email, sent on March 2, 2007, Stone told Sabo that, "It was dangerous to give GM these first day test results without us having an idea of the limitations of our test method and understanding the implications relative to our initial DMAX filter." (Pl.'s Resp. Ex. KK, Email from Stone to Sabo, 3/2/07). Four days later, on March 6, 2007, Stone emailed the gravimetric single pass test results to the Racor group working on this project. (Pl.'s Resp. Ex. LL, Email from Stone to Hardison, et al., 3/6/07). Stone stated, "From these data it appears that the Racor and Champion elements are fairly indistinguishable in terms of gravimetric efficiency." (Email from

Stone to Hardison, et al., 3/6/07). The next day, Hardison sent an email to Sabo reiterating that the gravimetric results were "consistent but not in anyone's favor," and "[t]he impact tests were not much better." (Pl.'s Resp. Ex. D, Email from Hardison to Sabo, 3/7/07). Hardison also noted that none of the fuel filters leaked during testing. (Email from Hardison to Sabo, 3/7/07). Hardison then suggested, "[t]he best that can be done is to cast doubt based on the construction and be vague on the high efficiency performance." (Email from Hardison to Sabo, 3/7/07).

In the face of these test results and conclusions by the Racor engineers, Racor made its on-site presentation to GM on March 7, 2007. The March 7, 2007, presentation was much more detailed than the March 2, 2007 presentation Racor emailed GM. Racor highlighted its long-term and fruitful relationship with GM, noting, in particular, that Racor helped GM solve its Duramax engine warranty issues by developing a Duramax fuel filter that could filter out contaminates smaller than four microns. (Pl.'s Resp. Ex. G, General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Warranty Problems Rise over Injector failures). Racor emphasized that GM did not notify Racor of its decision to make Champion its aftermarket supplier, and did not give Racor an opportunity to respond to the change, even though Racor absorbed all the tooling costs related to producing the filter. (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Fast forward 18 months later). Racor further asserted that the "will-fit" element was infringing on Racor's patents, stated that Racor has filed legal actions against Champion and other competitors for patent infringement, and asked GM "How does GM support patent infringement?" (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B,

Fast forward 18 months later). Racor questioned the Champion filter's ability to withstand impact in crash testing and stated that in previous tests "competitive product failed and leaked fuel, posing a significant safety hazard." (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Fast forward 18 months later). Racor also incorporated the technical comparison presentation that it emailed to GM on March 2, 2007, into the March 7, 2007, presentation, with some modifications. (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, General Motors Corporation Champion–Racor Technical Comparison). Notably, Racor expanded on the simulated impact test results, stating that neither filter leaked during testing. (General Motors Corporation Fuel Filter/Water Separator GM PN TP1298B, Champion Rolled Can Design Weakness: Simulated Impact Test Results).

After Racor made its presentation to GM, GM SPO employee Mark Leech emailed the March 2, 2007, presentation to JonCarlo Mancini, Champion's GM account representative. (Pl.'s Resp. Ex. OO, Mancini Dep. 55). Mancini reviewed the presentation with Champion engineers, and Champion engineers tested the Racor and Champion filters using all the tests Racor used in the March 2, 2007, presentation, except for the gravimetric test. (Mancini Dep. 55–57; Pl.'s Resp. Ex. RR, Champ's Response). Champion then prepared and presented a response to GM, using its test results to contradict Racor's technical data. (Pl.'s Resp. Ex. RR, Champ's Response). Champion presented to GM on May 1, 2007.

Based on the March 2, 2007, Racor presentation it received from GM, Champion, on June 11, 2007, filed a complaint in this Court alleging the following causes of action:

Count I: Violation of the Lanham Act (15 U.S.C. § 1125(a)(1))

Count II: Trade Disparagement

Count III: Business Defamation

Count IV: Interference with Contractual Relations

On July 13, 2007, Racor wrote to GM to "clarify and supplement" its March presentations. (Pl.'s Resp. Ex. GG, Ltr. from Dinges to Billbrough, 7/13/07). Racor noted that Champion did not have the March 7th presentation before it initiated the lawsuit, and Champion based its claims of inaccurate information on the March 2nd presentation, which was less detailed. (Ltr. from Dinges to Billbrough, 7/13/07). Racor admitted, however, that in reviewing the March 2nd presentation, Racor decided that it may have overstated certain points. (Ltr. from Dinges to Billbrough, 7/13/07). Racor went on to clarify the following points:

- "In the initial gravimetric test, a Champion filter was not readily available and the test was conducted on a Wix-brand filter. Through close inspection, Racor believed that the Wix filter was from the same manufacturer as the Champion filter and therefore would have the same characteristics. The gravimetric test as reported in the presentations showed that the Racor-manufactured filter performed marginally better than the Wix filter (again, incorrectly identified in the presentation as a Champion filter). . . . Also, subsequent and repeated test results on actual Champion-brand filters show that these filters are also relatively comparable to the Racor filter."
- Racor requested that GM disregard the gravimetric test as a basis for making its sourcing decision because it is difficult to run accurately on a repeated basis.

- Racor quantified its statement that the Champion lip seal "almost always" remains fixed to the mounting head during filter removal as occurring in 19 out of 32 cases.
- The Champion filter can be screwed on without the tap cap bottoming out.
- The impact testing, in which Racor reported that the Champion filter heads cracked, was a series of impact tests and, "upon further review, it appears that this was most likely due to material fatigue from a number of impact tests being conducted on Champion elements attached to the head."

(Ltr. from Dinges to Billbrough, 7/13/07).

The clarification letter did not sway GM from awarding Racor the aftermarket business. On November 7, 2007, GM SPO notified Champion that Champion would no longer be the supplier for the aftermarket fuel filters. (Def.'s Mot. Ex. U, Email from Billbrough to Phillips, 11 /7/07). GM SPO told Champion that engineering made the final decision to go back to Racor "due to unknown validation risks and the past issues we have had on this product they determined that it is too much of a risk to continue with the Champ design." (Email from Billbrough to Phillips, 11/7/07). Emails between Champion employees reveal that it also learned that GM went back to Racor, in part, "due to the advice of GM Legal due to GM's lawsuit against Bosch that will begin in the near future." (Def.'s Mot. Ex. V, Email from Phillips to Starring, 11/19/07).

John Gaither, Champion's corporate designee for this lawsuit, testified that he did not know whether GM believed the Racor presentation. (Def.'s Mot. Ex. J, Gaither Dep. 103). When asked by defense counsel, "Have you ever been told that one of the reasons Racor got the business back was, in partial, a return for a commitment

to pursue coalescer technology in the future?" Gaither replied, "I don't recall that, but it certainly looks like that." (Gaither Dep. 129–30). Gaither further testified that he did not know of any other documents or statements, other than the emails discussed above, from GM explaining why it chose to return the filter business to Racor. (Gaither Dep. 158–59). Neither Champion nor Racor has deposed GM in this lawsuit.

Champion lost 60–80% of its Duramax fuel filter business as a result of GM's decision; it did, however, retain 20–45% of its fuel filter business with GM. (Def.'s Mot. Ex. AA, Gibbons Dep. 70).

Presently before this Court is Defendant Racor's motion for summary judgment.

## II. STANDARD OF REVIEW

The United States Court of Appeals for the Sixth Circuit has summarized the legal standard for summary judgment motions as follows:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 500–01 (6th Cir.2007) (internal citations omitted).

## III. ANALYSIS

### A. False Advertising: Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)

Racor first argues that it is entitled to summary judgment because Champion cannot show that there is a causal link between the allegedly false statements and GM's decision to return the Duramax fuel filter aftermarket business to Racor. (Def.'s Mot. 11). Champion responds that it is entitled to a presumption of causation and harm, which is sufficient to survive summary judgment. (Pl.'s Resp. 16–17).

The relevant section of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> \* \* \*
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To state a cause of action for false or misleading advertisement under 15 U.S.C. § 1125(a)(1)(B), a plaintiff must establish that: "1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the ad-

vertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff." *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc., [hereinafter Podiatric Physicians ]* 185 F.3d 606, 613–614 (6th Cir.1999) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922–23 (3d Cir.1990); *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C.Cir.1990)). "The third and fifth elements-deception and injury-are both components of causation generally. The deception element asks whether the defendant's misstatements caused the consumer to be deceived. The injury element asks whether the defendant's deception of the consumer caused harm to the plaintiff. The sort of proof of these elements a plaintiff must show varies depending upon whether damages or injunctive relief is sought." *Id.*

■ In cases in which the plaintiff seeks to recover monetary damages, such as the case here, the plaintiff "may show either that the defendant's advertisement is literally false or that it is true yet misleading or confusing." *Podiatric Physicians,* 185 F.3d at 614. If the plaintiff proves that the statements made were literally false, the plaintiff prevails without evidence that the statements actually misled consumers because actual deception is presumed. *Id.* "Where statements are literally true, yet deceptive, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (i.e., evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product)." *Id.* A plaintiff relying challenging statements that are literally true yet misleading " 'cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react.' " *Id.* (quoting *Sandoz Pharm. Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 229 (3d Cir.1990)).

■ Champion alleges that Racor made false statements about the Champion filter to GM (Compl. ¶ 84), and for purposes of this argument, Racor assumes that Champion can show that the statements were false (Def.'s Mot. 16–17). Consequently, under Sixth Circuit precedent, literally false statements do not require proof that statements caused the consumer to be misled because actual deception is presumed. *Podiatric Physicians,* 185 F.3d at 614.

The actual deception presumption was also endorsed by the United States Court of Appeals for the Eighth Circuit in *Porous Media Corp. v. Pall Corp.,* 110 F.3d 1329 (8th Cir.1997). In *Porous Media,* the Eighth Circuit considered whether the presumption of actual deception, upon a showing of literally false statements, should be applied in comparative advertising cases where the plaintiff-competitor's product is specifically referenced or compared, such as the case presented here. 110 F.3d at 1335. The Court concluded that such a presumption should be applied, but held that the presumption was rebuttable if the defendant can show that it did not cause monetary damage to the plaintiff. *Id.* at 1336.

A predicate finding of intentional deception as a major part of the defendant's marketing efforts, contained in comparative advertising, encompasses sufficient harm to justify a rebuttable presumption of causation and injury in fact. Once it had established its claim, Porous still bore the burden of proving an evidentiary basis to justify any monetary recovery. These instructions, properly reconciled, balanced a recognition of the basic harm to a plaintiff who is targeted by deliberately deceptive comparative advertising with the statutory requirement that any monetary recovery under the

Lanham Act must represent compensatory damages shown to have been caused by the defendant.

*Id.* at 1336.

Racor's reliance on *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379 (5th Cir.1996), is misplaced, insofar as Racor concedes for the purposes of this motion that Champion can show that the challenged statements are false. In *Seven–Up*, the United States Court of Appeals for the Fifth Circuit affirmed the magistrate judge's order granting Coca–Cola's motion for judgment as a matter of law. 86 F.3d at 1387. In so doing, the Court noted that Seven–Up did not present any direct evidence that the decisionmakers relied on or was influenced by any of the material in the Coca–Cola presentation in deciding to distribute Sprite instead of Seven–Up. *Id.* "Instead, Seven–Up argues that the inference to be drawn from the fact that the board witnessed the presentation and then, immediately or within a short period of time, decided to switch soft drinks provides substantial evidence, on its own, to support the jury's verdict on causation." *Id.* at 1387. The Court rejected Seven–Up's argument explaining, "We have previously rejected inferences of causation based on the chronology of events, where the record contains undisputed testimony to the contrary or other equally credible theories of causation." *Id.* at 1388.

Although *Seven–Up* is factually similar to this case in that Champion has not presented any direct evidence that GM was influenced by Racor's presentation, *Seven–Up* is legally distinguishable because the Fifth Circuit either does not have or did not invoke the presumption that actual deception is presumed when the challenged statements are literally false. Because Racor concedes for the purposes of this argument that the statements are false, actual deception is presumed, and Champion does not have es-tablish a casual link between Racor's presentation and the harm to Champion. Accordingly, Racor is not entitled to summary judgment on this ground.

Racor next argues that it is entitled to summary judgment on Champion's Lanham Act claim because Racor's presentation was not "commercial advertising or promotion" as contemplated by the statute because the presentation was not sufficiently disseminated to the purchasing public. (Def.'s Mot. 14). Champion responds a single statement, statements made to only one customer, and statements made during private conversations may constitute actionable commercial advertising or promotion. (Pl.'s Resp. 13).

The Lanham Act prohibits false or misleading statements in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). "Commercial advertising or promotion" under the Lanham Act is defined as:

(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Int'l Technologies Consultants, Inc. v. Stewart*, No. 07–13391, slip op. at 6, 2008 WL 4378095 (E.D.Mich. Sept. 23, 2008) (Cook, J.) (citing *White Mule Co. v. ATC Leasing Co.*, 540 F.Supp.2d 869, 897 (N.D.Ohio 2008)). Racor contests only the fourth element of the commercial advertising or promotion test, i.e. whether the speech was sufficiently disseminated to the relevant purchasing public. Racor argues

that misrepresentations to a single customer in the context of negotiations does not constitute "advertising" or "promotion." (Def.'s Mot. 15).

In *Seven–Up*, the Fifth Circuit recognized that the required level of dissemination and relevant consumption by consumers will vary by industry. 86 F.3d at 1385. The Court further stated that when the pool of potential purchases in a market is relatively small, "even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act." *Id.* The Court ultimately held that Coco–Cola's presentation, titled "The Future Belongs to Sprite," which was shown to eleven bottling companies, out of a possible seventy-four, constituted "advertising" or "promotion" within the soft drink industry. *Id.* at 1386–87.

Judge Cook applied the *Seven–Up* principles in *Int'l Technologies*, holding that two letters the defendant sent to the customer and its financing company constituted advertising or promotion to the relevant purchasing public because the relevant industry, float glass plants, was very small. Slip op. at 7.

In the present case, the market for Duramax fuel filters, designed specifically for GM, is relatively small. In fact, as argued by Champion, "GM is the market for this part." (Pl.'s Resp. 14). This Court agrees. The "relevant purchasing public" for this part is GM. As a result, the presentation Racor gave to GM, in an admitted effort to sway GM to choosing its product over Champion's, was a promotional presentation that triggered the protections of the Lanham Act. *See Seven–Up*, 86 F.3d at 1385.

Defendant Racor's reliance on *Johnson Controls v. Exide Corp.*, 152 F.Supp.2d 1075 (N.D.Ill.2001), is unavailing. In *Johnson Controls*, the parties both bid on a contract to supply automotive batteries to Sears. 152 F.Supp.2d at 1077. The

defendant alleged that in the bidding process, the plaintiff made misrepresentations about its products capabilities. *Id.* The United States District Court for the Northern District of Illinois held that the presentation was not sufficiently disseminated because only Sears saw the presentation. *Id.* at 1082.

Unlike in the present case, the market in *Johnson Controls* for automobile batteries was relatively large. Here, Champion argues that the market at issue is very small and discrete, namely GM's aftermarket business, which is funneled through SPO. Racor argues that the market also includes the other aftermarket retailers Champion sold its filters to, such as Pep Boys. If the jury finds that the market is made up solely of GM, by showing the presentation to GM, Racor arguably sufficiently disseminated the presentation in the market. *See e.g., Seven–Up*, 86 F.3d at 1386. ("Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act."). Thus, there is a question for the jury as to whether Racor's statements were made for commercial promotion. Accordingly, Racor is not entitled to summary judgment on Champion's Lanham Act claim for insufficient dissemination.

Next, Racor argues that Champion cannot prove that the challenged statements are actionable, i.e. statements of fact and not opinion. (Def.'s Br. 17). Champion contends that Racor's false statements were not opinion. (Pl.'s Resp. 15–16).

█ A Lanham Act claim must be based on a statement of fact and not opinion. *Podiatric Physicians*, 185 F.3d at 614. To decide whether the statements were statements of fact or opinion, the Court must evaluate the statements within context. *Id.*

■ Champion challenges the following statements from Racor's March 2, 2007, presentation:

1) "Racor stated that this testing [gravimetric testing] show the Champion filter to have 'significantly lower efficiency removing critical particles less than 4 micron size . . .' as compared to the Racor filter." (Compl. ¶ 47).

2) "Racor stated that Champion's '[l]ip seal almost always remains in the head, stuck on the spud' and that Champion's filter 'is difficult to remove, specially in blind vehicle series'. . . and the design . . . 'may' allow the tool to scratch and damage the sealing surface." (Compl. ¶ 53).

3) "According to Racor, the depth of the gland between the filter's outer shell and plate where the o-ring sits is too deep. Racor speculated that, as a consequence, Champion's filter might 'bottom out' and create the possibilities of leaks. Racor claimed that it would have rejected Champion's filter due to this defect." (Compl. ¶ 56).

4) With respect to the fluted roll can design, "Racor stated that . . . Champion's design results in very sharp edges and causes 'many stress points' prone to vibration, wear, and leaks. Racor also state that Champion's design leaves the filter 'vulnerable to impact.'" (Compl. ¶ 64).

5) "Racor stated that the threads to the port on the Champion filter are 'oversized' and 'out of tolerance.' Racor therefore misled GM by stating that Champion's design could result in a 'massive fuel leak.' It also stated that the 'oversized threads' on the Champion element could allow 'the float switch to disengage from the element, especially in case of impact.'" (Compl. ¶ 68).

Racor argues, "All of these statements relate to asserted structural deficiencies in Champion's product, and many of the statements contemplate potential problems that may be associated with the structural deficiencies." (Def.'s Mot. 18). Based on this statement, it is clear that Racor has confused the meaning of "opinion" with that of speculation about future events based on factual statements. Racor's statements assert facts, purportedly based on its testing of the two products. Racor asserted test results and observations, and drew factual conclusions from the test results and observations. The presentation was based on and contained data gleaned from comparison testing of the two filters; it did not merely contain the personal beliefs of Racor's sales or engineering teams about the superiority of the Racor filter. Moreover, Racor does not sufficiently explain why the challenged statements are opinions and not facts. Pointing out that Racor speculated about the problems GM might incur if it used the Champion filters is not enough to show that the statements were opinion. Accordingly, this Court concludes that Racor has not shown that the statements were opinion, as a matter of law.

■ Racor's fourth, and final, argument, with respect to Champion's Lanham Act claim, is that this Court should grant summary judgment because Champion cannot prove that any of the statements were literally false, or that the statements were sufficiently misleading so as to deceive GM. (Def.'s Mot. 18). Champion did not directly respond to this argument, but did argue that there is sufficient proof that Racor deceived GM to survive summary judgment. (Pl.'s Resp. 18).

The emails from Racor engineers after the March 2, 2007, presentation was emailed to GM but before the presentation was made on March 7, 2007, and the letter Racor wrote to GM after this lawsuit was filed, undercut Racor's assertion that none

of the statements were literally false or misleading.

On March 2, 2007, Stone emailed Sabo to warn him that the testing results Sabo provided to GM were based on tests run on Wix filters, not Champion filters and, "If these are supposedly the same elements [filters], we saw far different results later in the day on Champion marked ones." (Pl.'s Resp. Ex. JJ, Email from Stone to Sabo, 3/2/07). In a follow up email, sent on March 2, 2007, Stone told Sabo that, "It was dangerous to give GM these first day test results without us having an idea of the limitations of our test method and understanding the implications relative to our initial DMAX filter." (Pl.'s Resp. Ex. KK, Email from Stone to Sabo, 3/2/07). With respect to the gravimetric single pass test results Stone stated, "From these data it appears that the Racor and Champion elements are fairly indistinguishable in terms of gravimetric efficiency." (Pl.'s Resp. Ex. LL, Email from Stone to Hardison, et al., 3/6/07) (Email from Stone to Hardison, et al., 3/6/07). The next day, Hardison sent an email to Sabo reiterating that the gravimetric results were "consistent but not in anyone's favor," and "The impact tests were not much better." (Pl.'s Resp. Ex. D, Email from Hardison to Sabo, 3/7/07). Hardison also noted that none of the fuel filters leaked during testing. (Email from Hardison to Sabo, 3/7/07).

In its July 13, 2007, letter to GM, Racor asked GM to disregard the gravimetric test results, quantified its statement that the Champion lip seal "almost always" remains fixed to the mounting head during removal, stated that the Champion filter can be screwed on without the tap cap bottoming out, and corrected its statement that Champion filter heads cracked on impact. (Pl.'s Resp. Ex. GG, Ltr. from Dinges to Billbrough, 7/13/07).

Viewing the evidence in the light most favorable to Champion, the non-moving party, this Court finds that Champion presented evidence that a jury could use to conclude that Racor made statements to GM that were literally false. Racor's engineers, and then Racor itself, contradicted the "results" and "data" contained in the presentation in inter-office emails and in the letter Racor wrote to GM. This evidence shows that there is a question regarding whether Racor's statements are literally false or were just misleading.

### B. Trade Disparagement/Injurious Falsehood

Racor argues that Champion cannot prevail on its claim for trade disparagement (a.k.a. injurious falsehood) because it cannot present sufficient evidence establishing a causal link between the alleged disparaging statements and GM decision to go back to Racor. (Def.'s Mot. 19). Champion responds that it has presented sufficient proof of trade disparagement to survive summary judgment, but Champion did not address the casual link argument. (Pl.'s Resp. 20).

The Michigan Court of Appeals recognized injurious falsehood as a cause of action in Michigan in *Kollenberg v. Ramirez,* 127 Mich.App. 345, 352, 339 N.W.2d 176 (1983). In so doing, the Michigan Court of Appeals adopted the elements of injurious falsehood set forth in the Restatement (Second) of Torts. Under the Restatement:

> [o]ne who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if:
>
> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Restatement (Second) of Torts, § 623A (1977).

In order to prevail on its injurious falsehood claim, Champion must show that Racor's statements were false, Racor knew of or recklessly disregarded the falsity, Racor intended for the publication to result in pecuniary harm to Champion, and pecuniary loss resulted from the false statement. *Kollenberg,* 127 Mich.App. at 352, 339 N.W.2d 176. Racor contests only that Champion will not be able to prove the last element: pecuniary loss resulted from the false statement.

■ Because there is no presumption of injury if the statements are proven to be actually false, and there is no evident that GM relied on Racor's presentation in making its decision, Champion must rely solely on the time that lapsed between the presentation and the decision. GM did not formally notify Champion that it would not continue to buy its filters until November 7, 2007, which is eight months after the March 7, 2007, presentation. Nonetheless, Champion has presented evidence that GM made its decision much earlier than November 7, 2007; Mancini testified that the decision had been in the works for several months, and Racor knew that it was getting business back because it spent five or six months in preparation with its supply chain. (Mancini Dep. 105). Nonetheless, the inference that can be drawn from the lapse of time between the presentation and the decision is not sufficient to show that GM's decision was a result of the allegedly false statements Racor made in its presentation. Absent evidence that GM premised its decision on the basis of presentation, Champion cannot show that its pecuniary loss resulted from the allegedly false statements. Champion, therefore, has not presented sufficient evidence

to survive summary judgment; Racor's summary judgment motion on Champion's trade disparagement claim is granted.

## C. Business Defamation

Racor argues that Champion's business defamation claim cannot survive summary judgment because Champion cannot prove that Racor's statements tended to prejudice Champion in its business dealings or deterred others from dealing with it. (Def.'s Mot. 19). Champion again contends that it has presented sufficient evidence to survive summary judgment. (Pl.'s Resp. 20).

■ In order to prevail on a defamation claim, the plaintiff must prove the following four elements: "1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication (defamation per quod)." *Frohriep v. Flanagan (On Remand),* 278 Mich.App. 665, 684, 754 N.W.2d 912 (2008). A corporation may assert a defamation action if "the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it." *Northland Wheels Roller Skating Center, Inc. v. Detroit Free Press, Inc.,* 213 Mich.App. 317, 328, 539 N.W.2d 774 (1995), quoting *Heritage Optical Center, Inc. v. Levine,* 137 Mich.App. 793, 797, 359 N.W.2d 210 (1984).

Again, because Champion has not presented direct evidence or persuasive circumstantial evidence that Racor's allegedly false statements prejudiced it in the conduct of its business with GM or deterred GM from dealing with it, Champion's business defamation claim must be dismissed. This is particularly true when Racor has

presented evidence that GM returned its fuel filter business to Racor because the Champion filter had not been validated, (Def.'s Mot. Ex. U., Email from Billbrough to Phillips, 11/7/07), and, "due to the advice of GM Legal due to GM's lawsuit against Bosch that will begin in the near future." (Def.'s Mot. Ex. V, Email from Phillips to Starring, 11/19/07). Summary judgment is, therefore, entered on Champion's business defamation claim.

### D. Interference with Contractual Relations

Lastly, Racor argues that it is entitled to summary judgment on Champion's interference with contractual relations claim because no breach of contract occurred. (Def.'s Mot. 20). Champion did not respond to this argument.

 The elements of tortious interference with a contract are: 1) the existence of a contract; 2) a breach of the contract; and 3) an unjustified instigation of the breach by the defendant. *Health Call of Detroit v. Atrium Home & Health Care Services, Inc.,* 268 Mich.App. 83, 89–90, 706 N.W.2d 843 (2005).

Champion has presented no evidence of a breach of contract. In fact, Champion does not even allege a breach of contract in its complaint. Rather, Champion states, "Racor's intentional misleading and false statements have interfered with Champion's relationship with GM and have caused this relationship to be less economically advantageous and caused other injuries to Champion." (Compl. ¶ 107). Because Champion does not even allege, much less provide proof of a breach of contract, and there is evidence that Champion continues to supply some fuel filters to GM, Champion's interference with contractual relations claim fails as a matter of law. This Court, therefore, grants Racor's motion for summary judgment on this claim.

## IV. CONCLUSION

For the reasons discussed above, the Court:

1) **DENIES** Racor's motion for summary judgment on Plaintiff's Lanham Act claim;

2) **GRANTS** Racor's motion for summary judgment on Plaintiff's trade disparagement, business defamation and interference with contractual relations claims.

SO ORDERED.

**In re: SEIZURE OF $143,265.78 FROM COMERICA CHECKING ACCOUNT NO. 1851349546 AND $28,687,40 FROM CHECKING ACCOUNT NO. 1080022185.**

Case No. 07–50329.

United States District Court,
E.D. Michigan,
Southern Division.

May 14, 2009.

Tauras N. Ziedas, United States Attorney's Office, Detroit, MI, for Respondent.

Christine E. Ficks, Bodman, Detroit, MI, for Movant.

*OPINION AND ORDER DENYING COMERICA BANK'S MOTION TO SET ASIDE FORFEITURE*

DAVID M. LAWSON, District Judge.

The government seized nearly $200,000 from the bank accounts of Global Consulting Group, Inc. and its principal, Raghu Vupputuri, alleging that the funds were proceeds from an illegal money laundering and visa forgery operation. The accounts were held by Comerica Bank, which claims an interest in the funds by virtue of a security agreement with its customers, Global Consulting and Vupputuri. Comerica filed a formal claim with the government, which was rejected as untimely and procedurally defective. Comerica now asks the Court to set aside the forfeiture, arguing that its claim was both timely and

properly presented, and insisting that the notice given was not "proper" within the meaning of the applicable statute because the bank's attorneys were not given notice simultaneously as they had requested previously. The Court heard oral argument from the parties on May 11, 2009, and now finds that Comerica failed to file its claim in accordance with the formal requirements of the administrative forfeiture statute, 18 U.S.C. § 983. The claim was properly rejected by the government, and this Court finds no grounds on which to set aside the forfeiture. Comerica's motion, therefore, will be denied.

I.

Global Consulting Group, Inc. and its principal, Raghu Vupputuri, had deposited funds in two Comerica Bank accounts. The United States Bureau of Immigration and Customs Enforcement obtained a seizure warrant from a United States magistrate judge on October 10, 2007 and executed the warrant the next day, according to the search warrant docket. The affidavit prepared in support of the seizure warrant claimed violations of laws prohibiting money laundering, 18 U.S.C. § 1956, and the forgery of visas, passports, and other entry documents, 18 U.S.C. § 1546, as the offenses that justified the forfeiture. The money allegedly was proceeds of those offenses.

Pursuant to the warrant, cash under the control of Comerica Bank was seized from the following accounts: $28,687.40 from trust account number 108022185; and $143,265.78 from checking account number 1851349546. Comerica Bank claims that it had no knowledge that Global Consulting or Vupputuri were engaged in illegal activity, and for the purpose of the present motion the government does not contest that point.

On October 17, 2007, an e-mail was sent from Sandra Jasinski, who purported to be an attorney representing Comerica, to Assistant United States Attorney (AUSA) Julie Beck concerning the seizure warrant. The message reads:

From: Jasinski, Sandra

Sent: Wednesday, October 17, 2007 3:35 PM

To: 'Julie.beck@usdoj.gov'

Subject: Global Consulting

Hello Julie:

Thank you for taking my call yesterday regarding the order served on my client, Comerica Bank. As I indicated, Comerica Bank has a security interest in the seized funds as a result of its loan agreements with Global Consulting. My client is in the process of gathering/organizing the loan documents in anticipation subsequent forfeiture proceedings. I will forward them to your attention as soon as I receive them. I would appreciate it if, to the extent you can, you would be so kind to keep me in the loop on how this matter progresses.

Is ICE handling this? Is there anything that you are liberty to share about the underlying investigation? From a review of PACER, it appears that there were some proceedings earlier this year against the Company's principal in connection with visa fraud, but that they were dismissed without prejudice.

Again, thanks for taking my call and being so helpful.

Regards,

Sandy Jasinski

Mot., Ex. B. A few days later, a follow-up letter was sent:

November 8, 2007

Julie Beck, Esq.

Assistant United States Attorney

United States. Attorney's Office

211 W. Fort Street, Suite 2001

Detroit, Michigan 48226

Re: Global Consulting Group, Inc.

Dear Ms. Beck:

I am following up to our telephone conversation regarding Global Consulting Group, Inc. and the seizure of sums in the company's deposit accounts that it maintained at Comerica Bank.

For your information, I am enclosing the following documents regarding the loan between Comerica Bank and Global Consulting Group:

1. Master Revolving Note dated September 7, 2006 in the amount of $500,000.00;

2. Security Agreement (All Assets) dated September 7, 2006;

3. Personal Guaranty signed by Raghu Vupputuri dated September 7, 2006;

4. UCC Financing Statements field on September 13, 2006; and

5. Automatic Loan Payment Authorization.

Pursuant to the terms of the loan documents, Comerica Bank has a perfected security interest in, among other things, the deposit accounts Global Consulting maintained at the Bank, including the funds described in the order served on the Bank on October 17.

Please consider this letter a request that I be provided with notice of any and all proceedings involving the funds seized from Comerica Bank in order for the Bank to protect its interest in the collateral securing its loan.

Regards,

[Signature]

Sandra L. Jasinski

Mot., Ex. C. There apparently was no written response from the United States Attorney's Office or any acknowledgment that courtesy copies of forfeiture paperwork would be sent to the bank's attorney.

On November 29, 2007, Wanda Vela, an agent with the United States Customs and Border Protection (CPB) agency, sent the following notice addressed to Comerica Bank at their branch at 17111 North Laurel Park Drive in Livonia, Michigan:

This is to officially notify you that on October 17, 2007, Special Agents from the Bureau of Immigration and Customs Enforcement in Detroit, Michigan seized $28,687.40 in U.S. Currency from Comerica trust account number 1080022185 and $143,265.78 in U.S. Currency from Comerica checking account number 1851349546 (Account holder: Global Consulting Group). The currency was seized and is now subject to criminal forfeiture pursuant to title 18, United States Code, section 982(a) for violation of title 18, United States Code, sections 1546 and 1946.

The facts available to U.S. Customs and Border Protection indicate that you might have an interest in the seized property. The purpose of this letter is to advise you of the legal options available to you concerning this seizure. Important documents are attached to this letter. Please do not ignore them.

. . .

If you take no action within thirty-five (35) days from the date of this notice . . . *your right to contest forfeiture will be extinguished.*

Govt's Resp., Ex. 2. The notice outlines options that the claimant may utilize, including abandoning the property or filing a claim. The government claims that the notice was sent by certified mail on November 29, 2007. Comerica concedes that the letter was sent and delivered, although at oral argument counsel stated that the bank cannot locate a copy of the document. The government has the return-receipt from the certified mailing. All parties agree that no notice was sent to Ms. Jasinski.

A few weeks passed with no claim being filed, so CBP served general notice of forfeiture by publication in the Detroit Legal News on January 24, 2008, January 31, 2008 and February 7, 2008. On February 22, 2008, the bank filed a petition for remission of the funds. The petition identifies the property as "$171,953.18 in funds from Account Nos. 1851349546 and 1080022185 held in the name of Global Consulting Group, Inc. at Comerica Bank, 39200 Six Mile Road, Livonia MI, 48152–2689." Mot., Ex. E. It asserts a claim "because Comerica has a valid, good faith, and legally cognizable interest in the seized property as lien holder the loan documents [sic] and had no knowledge of any illegal activities on the part of its borrowers," and attaches several pages of loan documents. *Ibid.* The petition is signed by two individuals. One is Barbara Utterback, a vice president, who signed underneath the statement "Unless otherwise stated, Comerica Bank has retained the above-named attorney to represent Comerica Bank in this matter. I have reviewed the foregoing petition and found that its contents are accurate to the best of my information and belief. I affirm that if Comerica receives any compensation for its losses, it will immediately notify the official who grants this petition (if it is granted) of that fact. I understand that this petition will be governed by the regulations, including definitions of terms such as "victim" and "related offense," set forth in 28 C.F.R. § 9.1, et. seq." *Ibid.* On the next page, Ms. Jasinski signed her name underneath the statement, "I hereby declare under penalty of perjury that upon information and belief the foregoing petition, including any attachments thereto, is true and correct in every respect." *Ibid.*

On July 11, 2008, Wanda Vela of CBP sent Jasinski a letter denying the petition as untimely and because it "does not meet the standards for a proper claim ..."

Mot., Ex. D. On December 1, 2008, Comerica filed a motion to set aside the forfeiture in this Court, to which the government responded.

## II.

Section 981 of title 18 authorizes the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 ... or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A). The government has alleged that the funds that had been on deposit at Comerica Bank in the accounts of Global Consulting Group, Inc. and Raghu Vupputuri were the proceeds of money laundering, 18 U.S.C. § 1956, and the forgery of visas, passports, and other entry documents, 18 U.S.C. § 1546. There appears to be no dispute to those allegations, so the money is subject to forfeiture.

Section 983 of title 18, enacted as part of the Civil Asset Forfeiture Reform Act ("CAFRA"), provides procedures that govern "all civil forfeitures under federal law unless the particular forfeiture statute is specifically exempted in 18 U.S.C. § 983(i)(2)." *United States v. One TRW, Model M14, 7.62 Caliber Rifle,* 441 F.3d 416, 418 (6th Cir.2006) (quoting *Deep Sea Fisheries, Inc. v. 144,774 Pounds of Blue King Crab,* 410 F.3d 1131, 1134 (9th Cir. 2005)); *see also* 18 U.S.C. § 983(a)(1)(A)(i) & (i)(1) (stating that it applies to "any nonjudicial civil forfeiture proceeding under a civil forfeiture statute" subject to certain exceptions). None of the exceptions applies here, and the parties agree that section 983 applies to this case.

Comerica claims that it has an interest in the deposited funds because it loaned money to Global and Vupputuri, and the accounts were pledged as security for the loans. The bank says it is entitled to the funds because it had no knowledge of its customers' illegal activities. According to the applicable statute, "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d). Comerica's security interest brings it within the definition of statutory "owner," 18 U.S.C. § 983(d)(6); however, to challenge the forfeiture, Comerica must make a claim to the government within a prescribed time limit after it is notified of the forfeiture, *see* 18 U.S.C. § 983(a)(2)(B). Under the statutory procedure, the notice of forfeiture by the government agency starts the claim period.

Section 983 requires that in non-judicial civil forfeiture proceedings, the government must provide notice to interested parties "in a manner to achieve proper notice as soon as practicable, and in no case more than 60 days after the date of the seizure." 18 U.S.C. § 983(a)(1)(A)(i). Any person who wishes to file a claim over the property may do so "with the appropriate official after the seizure." 18 U.S.C. § 983(a)(2)(A). This claim "may be filed not later than the deadline set forth in a personal notice letter (which deadline may be not earlier than 35 days after the date the letter is mailed), except that if that letter is not received, then a claim may be filed not later than 30 days after the date of final publication of notice of seizure." 18 U.S.C. § 983(a)(2)(B).

In this case, CBP sent its forfeiture notice to the Comerica Bank branch on November 29, 2007, notifying the bank that it had 35 days to file a petition for relief from the seizure. Comerica did not file its petition until February 22, 2008, well after the 35–day period expired. Since no claim was filed within the allowable period, the government entered a declaration of forfeiture. Comerica's claim to

the funds was rejected as untimely, among other reasons.

■ Comerica now seeks to set aside the forfeiture. A forfeiture can be upset only by bringing a motion under 18 U.S.C. § 983(e), which states:

(1) Any person entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute who does not receive such notice may file a motion to set aside a declaration of forfeiture with respect to that person's interest in the property, which motion shall be granted if—

(A) the Government knew, or reasonably should have known, of the moving party's interest and failed to take reasonable steps to provide such party with notice; and

(B) the moving party did not know or have reason to know of the seizure within sufficient time to file a timely claim.

18 U.S.C. § 983(e). This motion "shall be the exclusive remedy for seeking to set aside a declaration of forfeiture under a civil forfeiture statute." 18 U.S.C. § 983(e)(5). The Court lacks jurisdiction to review the merits of the forfeiture determination, but can only review the procedures followed. *Mesa Valderrama v. United States*, 417 F.3d 1189, 1196 (11th Cir.2005).

Comerica's argument is this: it was entitled to written notice of the forfeiture because of its interest in the accounts (which is undisputed); section 983(a)(1)(A)(i) requires the notice to interested parties to be "proper notice"; the notice CPB sent to the branch was not "proper notice" because a copy was not sent to the bank's attorney as previously requested; the bank did not receive proper written notice; therefore the bank is entitled to relief under section 983(e). Comerica also argues alternatively that its claim was timely either because the letter Ms. Jasinski sent on November 8, 2007 amounted to a claim, or the formal claim it filed on February 22, 2008 was made within 35 days of the last publication date.

The Court finds merit in none of these arguments.

■ First, Comerica has not established all the elements for relief under the terms of the statute. Section 983(e) allows the Court to grant relief from forfeiture after expiration of the claim period if the movant shows (1) it is entitled to written notice of the forfeiture; (2) it did not receive notice; (3) the government knew or should have known of the movant's interest in the property; (4) the government failed to take reasonable steps to provide notice; and (5) "the moving party did not know or have reason to know of the seizure within sufficient time to file a timely claim." 18 U.S.C. § 983(e). Comerica cannot satisfy the last element because it had actual knowledge of the seizure; the government took the money from the accounts in the possession of the bank even *before* the forfeiture notice was sent. Moreover, Comerica does not deny receipt of the forfeiture letter, and it admits its attorney was in contact with a government attorney within a week of the seizure of the funds.

■ Comerica also claims that the request made by Comerica's counsel that the AUSA "keep [her] in the loop on how this matter progresses" and that the attorney "be provided notice" constitutes a binding requirement on the United States Attorney (a different agency than the one pursuing the forfeiture) to provide notice to the bank's attorney, and the failure to do so renders any notice sent to Comerica improper. It bears repeating that Ms. Jasinski's request was only for a courtesy copy of any notices sent to the bank itself ("I would appreciate it if, to the extent you can, you would be so kind to keep me in the loop on how this matter progresses.").

Comerica cites no authority in the statute or elsewhere that allows a potential claimant to impose enhanced notice requirements on the United States. And there is no indication that the United States agreed to this request or misled Comerica in any way.

To find legal support, Comerica points to other statutes and rules, which it claims provides persuasive analogous obligations for service upon counsel. They do not. Comerica notes that under the Bankruptcy code, creditors may designate an address for notices to be sent. 11 U.S.C. § 342(e). Indeed, that statute allows individuals to restrict the types of notice that will suffice. If Congress intended to create a similar right to forfeiture contestants, it is evident that it knew how to do it. The absence of such a provision in the Civil Asset Forfeiture Act suggests that the failure to serve a forfeiture notice on the attorney for a represented claimant does not undermine the fact that the notice was "sent in a manner to achieve proper notice." *See* 18 U.S.C. 983(a).

Comerica also states, without explanation, that sending a certified letter to Comerica was insufficient under the federal rules, presumably relying on Federal Rule of Civil Procedure 5's edict that "[i]f a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party." Fed.R.Civ.P. 5(b)(1). That argument ignores the fact that the forfeiture in this case was non-judicial, well outside the purview of the Federal Rule of Civil Procedure. The requirements of the civil litigation rules do not establish or even augment the statutory procedures for administrative forfeiture.

Finally, Comerica argues that the Michigan Rules of Professional Conduct forbid a lawyer from contacting a client that the lawyer knows is represented. Mich. R. Prof. Conduct 4.2. However, Rule 4.2 permits contact when "authorized by law," such as when an attorney must serve notice directly on a client. *See* 9A Wright & Miller, Federal Prac. & Proc.3d § 2454 (noting that Rule 45 subpoenas must be served directly on individual, and service on attorney is insufficient); Rest. (Third) Law Governing Lawyers § 99 comment g. Moreover, the notice was provided by Wanda Vela, a forfeiture officer with CBP, who does not appear to be an attorney, and therefore the Michigan Rules of Professional Conduct do not apply to her.

■ Although this has not been raised by the parties, notice also must satisfy the requirements of Constitutional due process. *See United States v. Dusenbery,* 201 F.3d 763, 766 (6th Cir.2000); *see also Lobzun v. United States,* 422 F.3d 503, 507 (7th Cir.2005). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *see also Dusenbery v. United States,* 534 U.S. 161, 167, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002). "The 'reasonably calculated' standard is now widely accepted as the benchmark for resolving questions about the constitutionality of notice procedures." *Karkoukli's, Inc. v. Dohany,* 409 F.3d 279, 283 (6th Cir.2005). The use of certified mail to a claimant's last known address—which apparently was done here—typically satisfies due process, even in the absence of actual notice. *Dusenbery,* 534 U.S. at 171, 122 S.Ct. 694; *Lobzun,* 422 F.3d at 507 (noting that "[a]bsent exceptional circumstances, written notice of forfeiture by certified mail to the claimant's residence satisfies due process,

even if the claimant does not receive actual notice"). One exception to this rule is "when initial personal notice letters are returned undelivered, the government must make reasonable additional efforts to provide personal notice." *United States v. Ritchie,* 342 F.3d 903, 911 (9th Cir.2003) (collecting cases). Yet there is no indication that the letter was returned and marked as undeliverable.

Certainly, it would have been courteous, and even perhaps desirable, for the government to provide notice in accordance with Comerica's request; however, claimants' requests for convenience do not determine what is required under the due process clause. The mere fact that more could have been done does not make the effort at notice constitutionally suspect. *See Karkoukli's,* 409 F.3d at 284 ("For due process purposes, the focus must be on the constitutional adequacy of the statutory procedure and not on whether some additional effort in a particular case would have in fact led to a more certain means of notice."). The Court need not determine the limits of the concept of "proper notice" within the meaning of 18 U.S.C. § 983(a)(1)(A)(i). The evidence indicates that Comerica received actual notice of the seizure and an actual copy of the forfeiture letter. However, "proper notice" is defined, actual notice surely must fall within that definition.

The notice, therefore, was valid when it was sent to the client rather than the attorney. Comerica intimates briefly that "Comerica Bank's petition was timely because it was sent to ICE within 30 days of the last publication." Br. at 5. Although the statute does allow a claim to be filed within thirty days of the final publication of notice of seizure, this provision does not apply to a claimant who received other notice, unless "that letter is not received." 18 U.S.C. § 983(a)(2)(B). Comerica concedes that it received the letter at its Livonia, Michigan branch, so the fact that the formal petition was filed within thirty days of the last day of publication is irrelevant.

■■■ Comerica then advances the theory that its correspondence from Jasinski in October and November 2007, when "read together," constituted a claim. Although "[a] claim need not be made in any particular form," 18 U.S.C. § 983(a)(2)(D), each claim must: "(i) identify the specific property being claimed; (ii) state the claimant's interest in such property; and (iii) be made under oath, subject to penalty of perjury." 18 U.S.C. § 983(a)(2)(C). The most obvious defect in the correspondence was that it was not "made under oath, subject to penalty of perjury," and therefore cannot constitute a valid claim. *See ibid.* Nor is the set of letters signed by someone with personal knowledge. *See United States v. Currency $267,961.07,* 916 F.2d 1104, 1108 (6th Cir.1990) (holding that the requirement of verification makes the "notarized signature of an attorney ... insufficient ..."). "The purpose of [the oath] requirement is to prevent the danger of false claims in forfeiture proceedings by informing the court on oath or affirmation that the claimant is entitled to contest the forfeiture action by virtue of his interest in the defendant property." *Id.* at 1107. Although this case interprets a different procedure for contesting a forfeiture action, the Court believes it applies with equal force to the oath requirement of section 983.

The Court must conclude, therefore, that Comerica has not filed a timely and proper claim within the statutory period. Therefore, it is not entitled to relief under 18 U.S.C. § 983(e).

### III.

The Court must conclude that the government served proper notice of forfeiture

upon Comerica Bank, and Comerica's claim against the forfeited assets was untimely. Moreover, the correspondence from counsel filed in October and November 2007 did not amount to a proper claim.

Accordingly, it is **ORDERED** that Comerica Bank's motion to set aside forfeiture [dkt # 5] is **DENIED**.

**In re: SEIZURE OF $143,265.78 FROM COMERICA CHECKING ACCOUNT NO. 1851349546 AND $28,687,40 FROM CHECKING ACCOUNT NO. 1080022185.**

Case No. 07–50329.

United States District Court,
E.D. Michigan,
Southern Division.

May 18, 2009.

*OPINION ON FINAL JUDGMENT DENYING COMERICA BANK'S MOTION TO SET ASIDE FORFEITURE*

DAVID M. LAWSON, District Judge.

On December 1, 2008, Comerica Bank filed a motion to set aside forfeiture. The motion was docketed in the case number opened for the underlying seizure warrant. On May 14, 2009, 616 F.Supp.2d 699, 2009 WL 1395444 the Court entered an opinion and order denying Comerica Bank's motion to set aside declaration of forfeiture. The matter is now before the Court on whether to enter a judgment in this case.

Federal Rule of Civil Procedure 54(b) provides that "[w]hen an action presents more than one claim for relief ... or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed.R.Civ.P. 54(b). This rule imposes two requirements before a judgment may be entered on less than all claims or parties: 1) the decision must "entirely resolve[ ]" an individual claim or the dispute as to one party, and 2) there must be "no just reason for delay." *Lowery v. Federal Exp. Corp.*, 426 F.3d 817, 821 (6th Cir.2005).

In this case, the Court has "entirely resolved" the dispute as to Comerica Bank. Yet it is possible that another party will bring a motion to set aside the declaration of forfeiture. However, this motion would have no bearing on the Court's decision as to Comerica.

The Court also finds that there is "no just reason for delay." This requires consideration of the following factors:

"(1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense and the like."

*Lowery,* 426 F.3d at 822 (quoting *Gen. Acquisition, Inc. v. GenCorp, Inc.,* 23 F.3d 1022, 1030 (6th Cir.1994)). All of the factors favor entry of judgment as to Comerica Bank, or are neutral. There is no relationship between Comerica's effort to set aside the forfeiture and that potentially advanced by other claimants. Although it is unlikely that Comerica's appeal, if it chooses to take one, would be mooted by future developments, it is unknown whether any other claimant will step forward, delaying Comerica's right to appeal indefinitely, or perhaps permanently. There is no possibility that the court of appeals will be forced to review this legal issue again, and there is also no possibility of a set-off or other alteration to the decision against Comerica. Finally, although there is no indication of solvency issues, the potential that Comerica could be denied a right to appeal altogether strongly favors entry of

a judgment against Comerica Bank in accordance with the Opinion and Order entered on May 14, 2009.

Therefore, the Court will enter a final judgment as to Comerica's claim under Rule 54(b).

### FINAL JUDGMENT UNDER RULE 54(b) AS TO COMERICA BANK

In accordance with the Opinion entered this date,

It is **ORDERED AND ADJUDGED** that judgment is entered against Comerica Bank on its motion to set aside forfeiture. Comerica Bank's motion to set aside declaration of forfeiture is **DENIED.**

**Walter E. BARNETTE, Plaintiff,**

v.

**Nick DICELLO, et al., Defendants.**

**Case No. 5:06 CV 0784.**

United States District Court,
N.D. Ohio,
Eastern Division.

Nov. 9, 2007.

Joseph H. Taddeo, Richfield, OH, for Plaintiff.

Kenneth B. Baker, Michael D. Slodov, Javitch, Block & Rathbone, Cleveland, OH, for Defendants.

ORDER

JAMES S. GALLAS, United States Magistrate Judge.

Plaintiff, Walter E. Barnette in his third amended complaint claims that he is the inventor of a patented dust suppression guard used by defendants in the water-proofing business. He states that a patent was issued on December 16, 2006 and identified as U.S. Patent No. 6, 830,113 (the '113 patent). Mr. Barnette alleges that he understood that if he cooperated with the defendants' demands for assignment of the '113 patent to defendant Ohio State Home Services, his association with defendants would continue. Mr. Barnette further states that he did not realize the legal significance and ramifications of assigning the patent and did so without warning or opportunity to seek legal counsel and under duress and without sufficient consideration and that after assigning the patent his employment was terminated.

In the first count of the third amended complaint, Mr. Barnette alleges misrepresentation of material fact (fraud) in the assignment of the '113 patent. His second count, however, is an amalgam of allegations including: breach of duty of continued employment without sufficient notice, outplacement counseling or retraining or appropriate opportunities for transfer; that he is the sole inventor of the invention described in the '113 patent and that defendants Carl Moore and Sam Mazzo were listed as co-inventors when in fact they were not, but were part of the purpose or plan to deceive the patent office; that Mr. Barnette was subject to a confidentiality/non-competition agreement which prohibits his employment by a waterproofing company for two years; that defendants failed to notify or obtain Mr. Barnette's consent concerning certain specified matters in the patent application. These claims, constituting the second count, were

purportedly brought under 35 U.S.C. § 256. Mr. Barnette concludes the allegations in the second count stating that he requested the court to declare that he is the sole inventor and order the issuance of a certificate of correction with respect to inventorship. In his third count, Mr. Barnette claims that the defendants conspired against him by their inclusion of Sam Mazzo and Carl Moore as co-inventors, who were listed merely to be representatives for and protect the interests of Nick Dicello in violation of 35 U.S.C. § 102(f). In his fourth count, Mr. Barnette alleges wrongful termination, misappropriation of ideas and theft of trade secrets in violation of the Uniform Trade Secrets Act. In his fifth count, it is alleged that defendants infringed the '113 patent willfully and deliberately and with conscious disregard of Mr. Barnette's rights under that patent. In his sixth count, it is alleged that defendants made false ownership claims in violation of the Lanham Act, 15 U.S.C. § 1125(a), and in the seventh count, Mr. Barnette alleges that defendants made false and misleading claims to mislead, confuse or deceive potential customers to divert or interfere with Mr. Barnette's ownership claims, and patent rights, which resulted in unfair competition, false advertising and tortious interference with contract.

**Motion for Protective Order:**

■ Defendants have moved for protective order (ECF # 62) to prohibit the discovery sought by Mr. Barnette in his third request for discovery as well as for deposition. Defendants do not make specific objections to Mr. Barnette's discovery demands but oppose discovery essentially on the basis that this court lacks subject matter jurisdiction over the fifth count which asserts a claim for patent infringement. Defendants contend that because Mr. Barnette does not hold title to the '113 patent after its January 27, 2002 assignment to defendant Ohio State Home Services he has no standing to bring a patent infringement action. In support of this motion defendants cite *SKW America's v. Euclid Chem. Co.*, 231 F.Supp.2d 624 (N.D.Ohio 2002), for the proposition that if the plaintiff does not own a valid legal title to a patent he does not have standing to bring suit and the court is without subject matter jurisdiction over the cause. This motion for protective order, in effect, is a jurisdictional challenge.

Plaintiff admits in the third amended complaint that he assigned legal title to the '113 patent, so he does not hold legal title. Defendants state that this flaw was pointed out to Mr. Barnette but his response to this issue in discovery was that "we are operating under the regime of notice pleadings." Defendants then notified Mr. Barnette that they would seek a protective order. (Motion for Protective Order, Ex. 5, 6, ECF # 62). Defendants now argue that Fed.R.Civ.P. 26(c) permits them to apply for a protective order to avoid annoyance, harassment and undue burden and expense in complying with Mr. Barnette's discovery demands. Defendants' arguments were originally directed toward Mr. Barnette's fifth count alleging infringement of the '113 patent and their contention that there is not sufficient title behind Mr. Barnette's claims of infringement. However, during briefing the issue of Mr. Barnette's standing under 35 U.S.C. § 256 arose. Defendants state that they never alleged that this court did not have jurisdiction under this statute, but that the third amended complaint fails to state a claim. (Defendants' Reply to Plaintiff's Rebuttal, ECF # 74).

***Subject Matter Jurisdiction:***

■ In essence this matter represents a Rule 12(b)(1) jurisdictional challenge. "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff

must be construed as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky,* 381 F.3d 511, 516 (6th Cir.2004), *cert. denied,* 544 U.S. 961, 125 S.Ct. 1733, 161 L.Ed.2d 603 (2005); *Abbott v. Michigan,* 474 F.3d 324, 328 (6th Cir. 2007). In instances of facial attack, similar safeguards exist as would be under the case of Rule 12(b)(6). See *RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1134 (6th Cir.1996).[1] Defendants' motion can be viewed as a facial attack since the allegations in the third amended complaint concede assignment of the patent.

---

**1.** "A party seeking to invoke the jurisdiction of a federal court must prove that jurisdiction is proper. See *Boudreau v. United States,* 53 F.3d 81, 82 (5th Cir.1995), *cert. denied,* 516 U.S. 1071, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996); *Lowe v. Ingalls Shipbuilding, A Division of Litton Systems, Inc.,* 723 F.2d 1173, 1177 (5th Cir.1984). In this case, the burden falls on plaintiff. The allegations of his complaint must be taken as true and all inferences drawn in his favor. *Saraw Partnership v. United States,* 67 F.3d 567, 569 (5th Cir.1995); *Garcia v. United States,* 776 F.2d 116, 117 (5th Cir.1985). Dismissal is warranted only if those allegations, together with any undisputed facts and the court's resolution of disputed facts, establish that the district court lacks subject matter jurisdiction. See *Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 424 (5th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1059, 151 L.Ed.2d 967 (2002); *Santerre v. Agip Petroleum Co.,* 45 F.Supp.2d 558, 565 (S.D.Tex.1999)(footnote omitted)."

*Cole v. Gummow,* 2003 WL 22455387, *1 (N.D.Tex.).